David **BROAD** et al., Plaintiffs-Appellants,

v.

**ROCKWELL INTERNATIONAL CORPORATION et al.,** Defendants-Appellees.

No. 77–2963.

United States Court of Appeals, Fifth Circuit.

March 24, 1980.

John Andrew Martin, Dallas, Tex., Hugo L. Black, Jr., Thomas H. Seymour of Kenny, Nachwalter & Seymour, P.A., Miami, Fla., for plaintiffs-appellants.

Ernest E. Figari, Jr., David P. Seikel, Dallas, Tex., for Rockwell Intern. Corp., Collins Radio Co., Anderson, Bateman, Booth, Willard F. Rockwell, Jr., Roodhouse, Beall, Cattoi, Fulgham, Martin, Erickson, Drick and Raff.

William F. Carroll, William B. West, III, Dallas, Tex., John F. Egan, New York City, for U. S. Trust Co. of New York.

Donald L. Strauber, Terry Thompson, Edwin Scott, New York City, for Rockwell Intern. Corp.

Before COLEMAN, Chief Judge, KRAVITCH, and HENDERSON, Circuit Judges.

COLEMAN, Chief Judge.

## I

### Facts

In January 1967 Collins Radio Company (Collins) was a prosperous enterprise, engaged in the development and production of radio communication and aircraft navigation equipment. It offered and sold to the public $40,000,000 in 4⅞% Convertible Subordinated Debentures, due January 1, 1987. Chase Manhattan Bank, N.A., was the Trustee under the terms of the indenture agreement. By a supplemental indenture executed in May 1970 the United States Trust Company of New York (Trust Company) was substituted for Chase Manhattan.

Beginning in fiscal 1969 Collins suffered a series of economic reversals which resulted in declining sales and reduced income. In 1971 defendant Rockwell International purchased $35,000,000 of Collins' convertible preferred stock and obtained the right to elect a majority of the Collins Board of Directors. Rockwell soon exercised this right of control, electing Robert C. Wilson, also a Rockwell Director, as President and Chief Executive Officer of Collins.

In August 1973, Rockwell made a tender offer of $25.00 per share for all of the outstanding common stock of Collins and indicated its intent, if the offer succeeded, to merge Collins into Rockwell. By October 1, 1973, Rockwell had acquired approximately 75 percent of the outstanding common stock of Collins, which enabled it to effect a short-form merger upon the non-tendering minority shareholders of Collins. The Collins-Rockwell Agreement and Plan of Merger provided that each holder of Collins stock (other than Rockwell) would receive a cash payment of $25 per share, producing a "cash merger."

The 1967 Collins 4⅞% Convertible Subordinated Debentures are at the heart of this lawsuit. The debentures entitled the holders to convert into Collins common stock at a prescribed ratio. Rockwell took, and stands by, the position that under the debenture indenture agreement and as a re-

sult of the merger Rockwell and Collins were required to execute a supplemental indenture which would entitle the debentureholders to convert into the same thing which the holders of Collins common stock received in the merger. In other words, the stockholders received cash, hence the debentureholders had the right to convert into cash, but *only cash*. To put it succinctly, the debentureholders could not convert to stock in the merged corporation even though the original debenture agreement of 1967 had language which could be construed as providing for it.

In connection with the planned merger, Rockwell had its regular counsel review all of the agreements relating to Collins' outstanding debt and sought advice of counsel as to Rockwell's obligation under those agreements.

Counsel advised Rockwell that a debentureholder "would have the right . . . to convert the Debenture into the amount of cash that would have been payable with respect to the number of shares of Collins Common Stock into which the Debenture could have been converted immediately prior to effectiveness of the proposed merger," *that no further conversion right was required*. Rockwell received essentially the same advice from counsel for Collins.

The Trust Company, as trustee, engaged *outside counsel* to advise it in connection with the merger and any supplemental debenture. John Campbell and John Marden, partners in the outside law firm, reviewed the documents. They concluded (in September 1973) that at the time the 1967 debenture contract was executed the intent of the parties was that the right to convert into common stock *would survive a merger* and would remain as a right of conversion into securities of the surviving corporation as long as the debentures remained outstanding. Since Rockwell should assume upon the merger the same obligations to the Collins debentureholders as Collins had

prior to the merger, Rockwell would be bound to agree to an amendment providing that the debentures were convertible until 1987. According to Campbell & Marden's preliminary analysis, without the consent of each debentureholder Rockwell could not alter or impair the right to convert into common stock. Finally, these attorneys concluded that Rockwell's control of Collins imposed upon Rockwell and the directors of Collins a fiduciary obligation to the debentureholders. Campbell and Marden informed United States Trust of their initial opinion and also informed Rockwell's counsel of their general views. According to Campbell's deposition testimony, he subsequently changed his mind and accepted the analysis enunciated by Rockwell's counsel.[1] A formal opinion, concurring in the opinion offered by Rockwell and Collins counsel, was delivered on November 14, 1973.

However, on September 18, 1973, Campbell had advised the Trust Company that it had four alternative courses of action if Rockwell refused to assume the equity conversion rights after the merger: (1) the Trust Company could decline to execute a supplemental indenture unless it provided for a right to convert into Rockwell shares; or (2) the Trust Company, as a policy decision, could take no position as to the rights of the Collins debentureholders, then obtain a special and total indemnification from Rockwell for staying out of the controversy; or (3) the Trust Company could resign as indenture trustee; or (4) the Trust Company could seek a declaratory judgment with respect to the conversion rights. Campbell recommended Alternative 2, the course that was ultimately followed.

On October 11, 1973, Rockwell notified the debentureholders of the proposed merger and informed them that Rockwell and the Trust Company intended to execute a Supplemental Indenture which would provide for the assumption by Rockwell of the due and punctual performance and observance by Rockwell of all the terms,

---

1. Just when and why Campbell altered his opinion is not clear. Although Campbell testified that he had revised his preliminary views during the first week of October (prior to Rock-well's notification to debentureholders of the merger), other documents indicated that as late as January 1974 Campbell continued to see some validity in his earlier view.

covenants and conditions of the Indenture. The Supplemental Indenture does not alter or impair the rights accorded under the Indenture to holders of the Debentures and does not change the provisions of the Indenture.

The letter further informed the debentureholders that conversion provisions provided that the holders

> would have the right . . . to convert into the amount of cash that would have been payable with respect to the number of shares of Collins Common Stock into which the Debenture could have been converted immediately prior to effectiveness of the proposed merger.

The letter then calculated that after the merger, a $1000 debenture would be convertible into $344.75 cash.

> Another paragraph stated that the Trustee has advised that it does not take a position with regard to this letter or the statements herein, and that it has consulted with its counsel who confirmed that as Trustee it should not take a position with regard hereto.

Rockwell's letter precipitated letters from anxious debentureholders, inquiring about the status of their conversion rights. Rockwell responded with a form letter stating that Rockwell and Collins were relying upon the opinions of their counsel, but *refused requests for copies of those opinions. The Trust Company likewise declined to furnish counsel's opinions to the debentureholders.*

On November 14, 1973, Rockwell consummated the cash merger which had been announced on October 11, 1973. Pursuant to the terms of the merger agreement, a supplemental indenture was executed by Rockwell and the Trust Company as of November 1. Rockwell was substituted for Collins, and the conversion provisions were amended to allow each debentureholder to convert into cash.

## II

### *Procedural Background*

Plaintiffs, representing a class consisting of all holders of the debentures on the date of the merger, challenged defendants' actions with respect to the conversion provisions. Plaintiff contends that by the terms of the indenture the right to convert into Collins common stock survived the merger and that the debentureholders should be able to convert into the common stock of Collins' successor, Rockwell. Defendants deny any right to convert into Rockwell common stock, asserting that the right to convert into cash provided by the Supplemental Indenture satisfies the conversion terms of the original indenture.

Plaintiff debentureholders sued Rockwell, Collins, the control persons of both, and the Trust Company, seeking on behalf of the class either (a) restoration of the option to convert into common stock, (b) a judgment for the redemption price, or (c) acceleration of the obligation to pay the $1000 face amount of each debenture. They alleged (1) violations of § 10(b) of the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78j(b)), and rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5); (2) employment of deception, scheme or artifice to defraud; and (3) engaging in a practice or course of business which operates as a fraud. They contend that the defendants breached fiduciary duties owed to the plaintiffs and that defendants breached the debenture contract.

At the close of plaintiffs' case on the third day of trial, defendants moved for a directed verdict. The motion was granted as to all claims. In its conclusions of law, the District Court found that there was no violation of Section 10(b) or Rule 10b–5 in connection with either the issuance of the original debentures or the 1973 Supplemental Indenture. The Court concluded that the debenture agreement was not ambiguous and that, as a matter of law, the defendants' construction was correct. Consequently, the District Court found no elements of fraud, breach of fiduciary obligations, or breach of contract. The Court also concluded that plaintiffs had failed to show actual damages and determined that equitable relief would be inappropriate.

On appeal, plaintiffs urge seven grounds for reversal. On the federal claims it is asserted that the jury could reasonably have inferred that defendants violated Rule 10b–5 and that the debentureholders have suffered damages as a result of the 10b–5 violations. In the state law claims it is contended that the jury could have reasonably inferred (1) that Rockwell and the Trust Company breached the indenture contract when they executed a supplemental indenture eliminating the option to convert into common stock; (2) that Rockwell has breached an implied covenant to deal fairly and in good faith with the debentureholders; (3) that Rockwell and the Trust Company breached fiduciary obligations to the Collins debentureholders in eliminating the option to convert into common stock even if Rockwell had scrupulously complied with the merger statute and the debenture contract; (4) that the option to convert into common stock survived the supplemental indenture; and (5) that Rockwell is required to redeem the debentures at the redemption price specified in the contract or at the maturity price.

We affirm those portions of the District Court decision which denied recovery under Section 10(b) and Rule 10b–5.

We remand the case for trial primarily on the issue of breach of contract, as hereinafter set forth.

### III

### *The Standard for Review*

In considering the issues raised in this appeal we observe the standards for review of a directed verdict as articulated in *Boeing Company v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc):

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to

the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

### IV

### *State Law Claims* [2]

Since we must reverse and remand on the state law claims, we consider them first.

Plaintiffs' central contention is that Rockwell, Collins, and the Trust Company breached the indenture contract when they executed a supplemental indenture eliminating the option to convert into common stock. It is argued that the option to convert into common stock survived the supplemental indenture. Companion claims are that Rockwell breached an implied covenant to deal fairly with the debentureholders, and that under the contract Rockwell is required to redeem the debentures at the redemption price specified in the contract or at the maturity price. Plaintiffs further assert that both Rockwell and Trust Com-

---

**2.** The District Court has pendant jurisdiction to hear the state law claims. *United Mine Work-* *ers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

pany breached fiduciary duties owed the debentureholders.

## A. Breach of Contract

■ It is insisted that the trial court erred when it held as a matter of law that the indenture contract was unambiguous and that Rockwell correctly construed the Indenture in 1973, fully respecting the rights of the Collins debentureholders when Rockwell and Collins merged.[3]

The relevant indenture provisions are §§ 4.01, 4.11, 13.01, 13.02, 14.01, and 14.02, set out in full in an appendix to this opinion and which may be summarized as follows:

Article Four deals expressly with the conversion of the debentures. Section 4.01 establishes the conversion right and provides that prior either to January 1, 1987, or to redemption if the debentures are called for redemption prior to that date, any debenture may be converted at the principal amount into common stock of the company at an initial conversion price of $72.50 per share, with subsequent conversion prices to be determined in accordance with § 4.04.

Section 4.11 provides in pertinent part:

In case of . . . any merger of the Company into, any other corporation . . . the corporation into which the company shall have been merged . . shall execute and deliver to the Trustee a supplemental indenture . . . providing that the holder of each Debenture then outstanding shall have the right (until the expiration of the conversion right of such debenture) to convert such Debenture into the kind and amount of shares of stock and other securities and property receivable upon such . . . merger by a holder of the number of shares of Common Stock of the Company into which such Debenture might have been converted immediately prior to such . . . merger. . . .

Article Thirteen governs supplemental indentures. Section 13.01 authorizes the Trustee to enter into supplemental indentures for a limited set of purposes, one of which is "to make provision with respect to the conversion rights of holders of Debentures pursuant to the requirements of Section 4.11," *provided such action does not adversely affect the debentureholders.* The section also states that any supplemental indenture entered for those limited purposes may be executed without the consent of the debentureholders, "notwithstanding any of the provisions of Section 13.02".

Section 13.02 provides that *without the consent of the debentureholders* no supplemental indenture shall extend the fixed maturity of the debenture, reduce the principal, reduce the rate or extend the payment of interest, reduce the premium, or "alter or impair the right to convert the same into Common Stock at the prices and upon the terms provided in this Indenture."

Article Fourteen outlines additional provisions governing any consolidation, merger, or sale of the company. Section 14.01 stipulates that in any consolidation, merger, or sale, the new corporation will expressly assume "the due and punctual performance and observance of all the terms, covenants and conditions of this Indenture to be performed or observed by the Company."

Section 14.02 states that in case of any consolidation, merger, or sale, the successor corporation shall succeed to and be substituted for the Company upon the execution of a supplemental indenture according to § 14.01 and upon compliance by the successor corporation with all applicable provisions of § 4.11.

It is plaintiff's contention that these provisions, read together, secure to the debentureholders the right upon a merger of Collins to convert into common stock of the successor company. He notes that the sec-

---

**3.** In Conclusion of Law No. 11 the District Court stated that "the Indenture provisions governing the debentureholders' conversion rights upon a merger are not ambiguous. Those rights can be ascertained from the four corners of the instrument." In Conclusion No. 14 the Court asserted that "[t]he Indenture mandated that the conversion rights upon a merger become a right to convert into that which the Collins shareholders received in the merger."

tion establishing the conversion right extends that right until either January 1, 1987, or the redemption of the debenture and does not expressly limit that right upon a merger. Plaintiff reads § 4.11 as creating rights for debentureholders in addition to the right of conversion. Thus, under this view, upon a merger, debentureholders have both the right to convert into common stock of the successor company and the right to convert into whatever property the Collins shareholders have. Plaintiff concedes that § 13.01 allows the Trustee to enter into a supplemental indenture pursuant to a merger without the consent of the debentureholders, but contends that this authority is limited to those aspects that do not adversely affect the rights of the debentureholders. He relies upon § 13.02's requirement of debentureholder consent before a supplemental indenture can alter or impair the conversion right as enhancing the view that any supplemental indenture removing the right to convert in common stock adversely affects the debentureholders' rights.

The defendants read § 4.11 as the exclusive statement of the debentureholders' conversion rights upon a merger. They point out that § 4.11 provides that the debentureholders are to receive a right to convert into whatever form of property the holders of common stock receive in the merger. The holders of Collins common stock received cash in the merger, not Rockwell common stock. Thus, defendants argue, the holders of Collins convertible debentures were to receive and did receive the right to convert into an equivalent amount of cash, not Rockwell common stock.

It is further asserted that the other provisions of the indenture are consistent with this view of § 4.11. They point out that § 14.01 expressly declares that nothing in the indenture shall prevent a merger of Collins into another corporation and § 14.02 provides that the successor corporation shall, in that event, enter into a supplemen-

tal indenture with the trustee, assuming its obligations under the Indenture and complying "with all applicable provisions of § 4.11." They assert that § 13.01 "plainly states that such a supplemental indenture 'may be executed by the Company and the Trustee without the consent of the holders of any of the Debentures . . . ,' notwithstanding any of the provisions of § 13.02."

Defendants cite *B. S. F. Co. v. Philadelphia National Bank*, 42 Del.Ch. 106, 204 A.2d 746 (Del.1964) wherein the Trustee under an indenture securing an issue of debentures brought suit challenging a sale by B. S. F. of "substantially all" of its assets to Glen Alden Corp.

We find the decision in *B. S. F.* inapplicable to this situation. In *B. S. F.* the question of the conversion right involved a sale of assets, *not a merger*. B. S. F. continued to exist and conduct business after the transaction. Moreover, the right of the debentureholders to convert into common stock of B. S. F. was in no way affected by the transaction. Indeed, the court specifically noted that the debentureholders still possessed the option to convert into B. S. F. stock.[4]

Defendants also cite *Brucker v. Thyssen-Bornemisza Europe N. V.*, 424 F.Supp. 679 (S.D.N.Y.1976), *aff'd sub nom. Brucker v. Indian Head, Inc.*, 559 F.2d 1202 (2d Cir.), *cert. denied sub nom. Rome v. Indian Head, Inc.*, 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 183 (1977). There, several holders of convertible debentures objected to a Rule 23 settlement proposal which allowed debentureholders, as part of a merger, to convert for cash but did not grant them the right to convert into common stock. Asserting that the court can in no way alter the debentureholders' contract rights under the indenture, they argued that the indenture prevented a forced conversion into money in the event of a merger. The objectors

---

4. The Court observed that "the right of conversion of the debentures into stock of B. S. F. is still preserved and the debenture holders can

exercise their election to convert their debentures into B. S. F. stock in accordance with the terms of the debentures." 204 A.2d at 751.

contended that § 12.02,[5] which provided for approval by two-thirds of the outstanding debentures when the issuer wished to change the indenture itself and which required consent of each debentureholder when the right to convert is altered or impaired, should be interpreted to require the written consent of each debentureholder, since an attempt was being made to alter or impair the conversion right. 424 F.Supp. at 689.

The parties to the settlement argued that the voting requirements of § 12.02 did not apply in the case of a merger. Rather, they stated that §§ 5.06,[6] 13.01,[7] and 13.02[8] should govern the merger, since these sections specifically discuss what is to occur in case of a merger.

The district court agreed, stating that § 5.06 should control because it contained a detailed and specific provision as to what the debentureholders' rights are in a merger while § 12.02 dealt with their rights in a general context. *Id.* The Court then read § 5.06 to require only that debentureholders have the right to convert into whatever form of property the shareholders receive in the merger. Since the stockholders received only cash as a result of the merger, the debentureholders were entitled only to the right to convert into cash. The Second Circuit orally affirmed the District Court decision from the bench, on the basis of the opinion below.

However, under the local rules of the Second Circuit, an oral opinion carries no precedential value. The decision thus remains, for all intents and purposes, that of a district court.

We cannot agree with the view adopted in *Brucker.* We do not think that on its face the Collins debenture agreement speaks with the requisite clarity to the issue before us. To be sure, § 4.11 does deal in the most detail with the conversion rights in the event of a merger, but § 4.11 does not specify a limitation on the reach of the provisions of Article Thirteen, which protects the debentureholders against any supplemental indenture which would adversely affect the interests of the debentureholders.

We consider that a supplemental indenture which alters a conversion right has a potentially adverse effect on those interests. As the Second Circuit observed in *Van Gemert v. Boeing Co. (I)*, 520 F.2d 1373 (2d Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975),

What one buys when purchasing a convertible debenture in addition to the debt obligation of the company incurred thereby is principally the expectation that the stock will increase sufficiently in value that the conversion right will make the debenture worth more than the debt. The debenture holder relies on the opportunity to make a proper conversion on due notice." *Id.* at 1385.

See also *Kusner v. First Pennsylvania Corp.*, 531 F.2d 1234, 1238 (3rd Cir. 1976) ("The possibility that the value of common stock will increase to a point where it exceeds the value of the bond is the sales feature with which the issuer obtained a lower-than-market interest rate on the bond.").

In *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971), a challenge to the tax treatment of convertible debenture issues, the Second Circuit expressly recognized that part of the selling price of the debenture was attributable to the conversion feature. The Court pointed out that the debentures provided for two mutually exclusive modes of satisfying the obligation: "Under one the holder may exercise his right to convert the debenture into common stock, in which event he will surrender his debenture and it will not be redeemed or paid at maturity. . . . The alternative to conversion is that the [issuing corporation] will redeem the deben-

---

**5.** Section 12.02 was in essence the same as § 13.02 in the Collins indenture.

**6.** The language in § 5.06 parallels that of § 4.11 in the Collins indenture.

**7.** Section 13.01 corresponds to § 14.01 of the Collins indenture.

**8.** Section 13.02 corresponds to § 14.02 of the Collins indenture.

ture or pay it at maturity, in which event the conversion privilege will be terminated . . . ." 453 F.2d at 304.

Consequently, the alteration of the conversion right affects a significant interest under the indenture. The indenture itself reflects the importance of this right when it prohibits an alteration or impairment of the conversion right without the consent of each affected debentureholder.

Finally, the prospectus *affirmatively represented* that the right to convert to common stock would continue until January 1, 1987. The debenture certificates, themselves, confirmed those representations.

█ J. C. Lynch, an attorney who assisted in the preparation of the prospectus for Collins, testified that he understood at the time the indenture was executed that the right to convert into common stock could not be taken away by a cash merger. It is not insignificant that at the time the debentures were issued the law of Iowa, the State in which Collins was incorporated, did not allow cash mergers, a fact which shaped the views of Mr. Lynch.[9]

For all of the foregoing we hold that the indenture contract was, and is, ambiguous.

We decline to hold that as matter of law § 4.11 *overrides* the protection enunciated in Article 13. Viewed together, the sections leave plenty of room for a difference of opinion as to what the indenture contract mandates in the situation we have before us. Certainly, the suggestion that § 4.11 is an anti-dilution provision designed to insure that during a merger the stockholders do not receive more than the debentureholders

is as reasonable and plausible as the opposing view that § 4.11 is the exclusive statement of what conversion rights the debentureholders will have in the event of a merger.

█ It is axiomatic that the determination of whether an ambiguity exists is for court determination. If ambiguity is present then parole evidence going to the intent of the parties is in order.[10]

█ The jury should have been allowed to ascertain the nature of the conversion right, whether the defendants' action breached that right, and whether the right to convert into common stock survived the Supplemental Indenture. The directed verdict should not have been granted because at that point the plaintiffs had adduced sufficient evidence to go to the jury on the actual meaning of the contractual provisions in issue.

### B. *Implied Covenant of Fair Dealing*

█ As a second component of the breach of contract claim, plaintiff contends that Rockwell and the Trust Company breached an implied covenant to deal fairly and in good faith with the debentureholders. By the terms of the indenture, New York law governs the contractual claims.

In *Van Gemert v. Boeing Co. (I)*, 520 F.2d 1373 (2d Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975), the Court considered an allegation that debentureholders had not received adequate notice of the redemption of the bonds to allow the holders to exercise their conversion. The

---

9. Defendants point out that by the terms of the indenture, New York law governs the interpretation of the contract. *See* § 17.12. They stress that § 4.11 provides for the debentureholders to convert into the kind and amount of "shares of stock and other securities and *property*" received by the holders of common stock (emphasis added). As we understand New York law, it considers money to be property. *People v. Wagner*, 120 Misc. 214, 217, 198 N.Y.S. 65, 68 (Sup.Ct.1923), *aff'd*, 208 App.Div. 828, 203 N.Y.S. 946 (1924); *Fullerton v. Young*, 46 Misc. 292, 294, 94 N.Y.S. 511, 512 (Sup.Ct. 1905). While New York law is dispositive of what constitutes property in the event of a

cash merger, it does not determine the issue of whether the parties intended this right to convert to be the exclusive conversion right in case of a cash merger. While Iowa law is not dispositive either, plaintiff may find it useful in helping establish the contemplation of the parties at the time the indenture was agreed upon.

10. Defendants argue that the use of extrinsic evidence should be rejected because the indenture employed standard boilerplate provisions. We disagree. When the use of boilerplate provisions creates ambiguity, the need to know what the parties were trying to do by using those forms becomes even more important.

Court noted the particular importance of the conversion feature of the debentures and found that although notice provisions were contained in the 113-page debenture agreement, this was an inadequate means of apprising the debentureholders of what notice would be given of a redemption call. Because of the importance of the right of conversion, more than a technical compliance with the debenture terms was necessary if the debentureholders were to be treated fairly. In *Van Gemert v. Boeing Co. (II)*, 553 F.2d 812 (2d Cir. 1977), the court explained that in *Van Gemert I*

> we merely applied the settled principle, "that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ." *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933). Simply stated, every contract contains the implied requirement of good faith and fair dealing. Boeing was found liable therefore because it breached its contract with appellants, and damages were awarded.

553 F.2d at 815.

Similar considerations must apply to this case, where once again the issue is compliance with a debenture contract of which the right to convert is an important element. The plaintiff has introduced evidence of the debentureholder's understanding that the conversion feature would last for the life of the security. He has produced testimony about Rockwell's and the Trust Company's actions in creating a supplemental indenture in which the right to convert into common stock became, upon the merger, a right to convert into cash. This evidence, hereinabove recited, is sufficient to send the issue to the jury. Defendant, of course, may produce testimony to demonstrate that, in the context of Collins' situation, the action was fair to the debentureholders. But the final resolution in such a case belongs to the jury.

### C. Breach of Fiduciary Duty

In addition to the claims based on the contract, plaintiff asserts that Rockwell and the Trust Company violated fiduciary duties they owed to the debentureholders— Rockwell, because of its position as a stockholder in Collins; Trust Company by virtue of its position as trustee under the indenture.

Fiduciary claims impose obligations beyond those expressly stated in the contract. They are not contractual provisions, and the extent of fiduciary duties cannot be ascertained by reference to contract interpretation. Thus whatever obligations defendants owed the debentureholders must flow from federal and state bodies of corporate fiduciary law.

#### 1. Rockwell

Rockwell concedes that it owed the debentureholders a fiduciary duty of good faith and fair dealing. Although courts have more frequently addressed the obligations of controlling shareholders toward the corporation and the minority, *see, e. g.*, *Zahn v. Transamerica Corp.*, 162 F.2d 36 (3rd Cir. 1947); *Bryan v. Brock & Blevins Co., Inc.*, 490 F.2d 563 (5th Cir.), *cert. denied*, 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974), a number of courts have stated that these fiduciary obligations extend to debentureholders and creditors as well. *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971); *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Brown v. Presbyterian Ministers Fund*, 484 F.2d 998, 1005 (3rd Cir. 1973); *Bayliss v. Rood*, 424 F.2d 142 (4th Cir. 1970). In *Pepper v. Litton*, 308 U.S. at 311, 60 S.Ct. at 247, the Supreme Court indicated that a majority stockholder is bound by the "fiduciary standards of conduct which he owes the corporation, its stockholders *and creditors*" (emphasis added). Elaborating on this observation, the Court stated

> He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage

and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised· for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis.*

308 U.S. at 311, 60 S.Ct. at 247.

While courts have recognized these obligations, they have also rejected attempts to expand specific contractual rights to hold that a corporate defendant or a controlling shareholder had a "duty" to the plaintiff that extended beyond performance of the contract. *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 562 F.2d 1040 (8th Cir. 1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978); *Fershtman v. Schectman,* 450 F.2d 1357 (2d Cir. 1971), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); *Ryan v. J. Walter Thompson Co.,* 453 F.2d 444 (2d Cir. 1971), *cert. denied,* 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1971). Where the defendant had fully complied with the contract, he had discharged his obligation.

▇▇▇ We think a similar view is appropriate in this case. If the jury finds that Rockwell fully complied with the terms of the debenture agreement, then the fiduciary duty claim should not be reached. Rockwell's duty to the debentureholders was to see that they were treated fairly and that they received what they were entitled to under the agreement. A finding that the contract's terms were fully complied with is conclusive demonstration that Rockwell performed its duty.

▇▇▇ On the other hand, a jury finding that Rockwell breached the contract does not automatically lead to a determination that Rockwell breached its fiduciary duty. In considering fiduciary duty claims, the courts have generally required a showing of bad faith, fraud, or unfair conduct.

*See, e. g., Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Wright v. Heizer Corp.,* 560 F.2d 236, 250 (7th Cir. 1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978); *Polin v. Conductron Corp.,* 552 F.2d 797, 809 (8th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977); *Bryan v. Brock & Blevins Co., Inc.,* 490 F.2d 563 (5th Cir.), *cert. denied,* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed. 72 (1974); *Lebold v. Inland Steel Co.,* 125 F.2d 369 (7th Cir. 1941). If, for instance, Rockwell acted in good faith, based on a reasonable understanding of the contract, then it would not have violated its fiduciary obligation even though it breached the contract. If, however, Rockwell acted in bad faith or unfairly with respect to the debenture agreement, then it breached its duty to the debentureholders. Whether Rockwell's conduct was unfair or in bad faith is, of course, an issue for the jury.

### 2. The Trust Company

▇▇▇ The alleged fiduciary obligations of the Trust Company as trustee raise both federal law and state law issues. The duties of the Trust Company must be measured by the requirements of the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa *et seq.,* by the Indenture, and by state-law mandates. The Trust Indenture Act prescribes the contents of indenture agreements underlying corporate debentures of the sort involved here. There is no allegation that the indenture agreement failed to comply with the statutory requirements, but rather that the Act creates a fiduciary obligation in addition to the duties expressed in the indenture itself. We find nothing in the Act that imposes upon a Trustee any obligations beyond those contained in the indenture. Section 315(a) of the Act permits the trustee's responsibilities under the Act to be limited to the terms specifically set forth in the indenture.[11]

---

11. 15 U.S.C. §§ 77*ooo* (a)(1) states that the indenture may provide that "the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture."

In *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078 (2d Cir. 1977), the Second Circuit considered an allegation that the trustee under a convertible debenture agreement in connection with a sale of certain corporate assets was liable for its failure to negotiate a better conversion price for the debentureholders and to make its views known on the adequacy of the conversion price offered. The Court refused to find a fiduciary obligation imposed by the Indenture Act and thus concluded that the bank had no duty to negotiate for a fair conversion price or to make known its views regarding the fairness of the price offered. 560 F.2d at 1083. We think those observations are applicable in the situation before us. We thus refuse to find a fiduciary obligation inherent in the Trust Indenture Act.[12]

At the same time, however, we do not read the Act to preclude the imposition of state fiduciary duties on indenture trustees.[13] The Trust Indenture Act, § 323, 15 U.S.C. § 77www(b), provides in part that the "rights and remedies provided by this subchapter shall be in addition to all other rights and remedies that may exist . . at law or in equity." We find nothing to indicate that the Act was an effort to limit the protection for debentureholders. *See also United States Trust Company of New York v. First National City Bank*, 57 A.D.2d 285, 394 N.Y.S.2d 653 (N.Y.Sup.Ct.1977).

We now examine New York law to see if it allows the imposition of fiduciary duties on indenture trustees. We find illumination in *Dabney v. Chase National Bank of City of New York*, 196 F.2d 668 (2d Cir.

1952). Considering an indenture executed before the Trust Indenture Act and governed by New York law, the Court stated that the trustee's obligations exceeded the narrow definitions of its duties in the indenture and encompassed fiduciary duties as well. The Court rejected an interpretation, advocated here by the Trust Company, of language in *Hazzard v. Chase National Bank*, 159 Misc. 57, 287 N.Y.S. 541 (Sup.Ct. 1936), *aff'd without opinion*, 257 App.Div. 950, 14 N.Y.S.2d 147 (1st Dept. 1939), *aff'd without opinion*, 282 N.Y. 652, 26 N.E.2d 801 (1940), *cert. denied*, 311 U.S. 708, 61 S.Ct. 319, 85 L.Ed. 460 (1940), which appeared to restrict the trustee's duties to the terms of the agreement. Instead, the Court found a fiduciary duty imposed on the Indenture Trustee under New York law. According to the Court, "a trust for the benefit of a numerous and changing body of bondholders appears to us to be preeminently an occasion for a scruple even greater than ordinary; for such beneficiaries often have too small a stake to follow the fate of their investment and protect their rights." 196 F.2d at 671. New York lower court decisions indicate that the Second Circuit's analysis is still good law. *See United States Trust Company of New York v. First National City Bank*, 57 A.D.2d 285, 394 N.Y. S.2d 653 (N.Y.Sup.Ct.1977) (citing *Dabney* with approval).[14]

We thus hold that the Trust Company was cloaked with a fiduciary duty to the debentureholders. Whether the Trust Company violated that duty is for the jury.[15]

---

**12.** Article Ten of the indenture agreement sets out the Trustee's obligations under the indenture. The relevant portions are reproduced in the Appendix to this opinion.

**13.** *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078 (2d Cir. 1977), dealt solely with fiduciary obligations under federal law and did not expressly treat obligations under state law.

**14.** The Trust Company contends that the language of *Dabney* must be limited to situations in which a default has occurred. We read

*United States Trust Company of New York* to express a broader view of fiduciary duties.

**15.** Trust Company in its brief outlines a series of facts which, it asserts, demonstrates that the Trust Company more than complied with its obligations under the debenture, evidencing a "punctilious regard by the Trust Company for the rights of the Debentureholders." Those facts would be relevant to a jury's determination of whether the Trust Company breached its fiduciary duty, but they do not, as a matter of law, allow the Trust Company to go forth unscathed.

### D. *Damages*

As an alternative ground for granting its directed verdict motion, the District Court concluded that the plaintiff had failed to demonstrate any actual monetary damages and that the equitable relief the plaintiff sought, *i. e.*, redemption of the debentures or restoration of the common stock conversion privilege, was inappropriate. The Court also held that the plaintiff had failed to show that the contractual conditions precedent to any acceleration of the debt had occurred.

Plaintiff's damage claims are limited to those which are available under his state law actions, *i. e.*, breach of contract and breach of fiduciary duty, and we agree with the trial court that equitable relief is inappropriate in these circumstances, as traditional legal remedies are sufficient.

If the jury agrees with plaintiff's interpretation of the indenture agreement and finds that Collins and Rockwell breached that agreement, then the District Court may find the defendants in default under the terms of the debenture and require them to comply with the default provisions. The default provisions do not constitute equitable remedies; a breach of the agreement is a contractual condition of the default provisions. Failure to adhere to the default agreement renders the company liable for money damages, *i. e.*, the difference between the default payment and the fair market value of the bond.

Article Nine of the indenture outlines the remedies of the debentureholders in the event of default. According to the provisions of that article, upon default the holders of not less than 25 percent of the principal amount of the debentures may declare the principal and accrued interest due and payable immediately, in effect accelerating the maturity of the debt. Enumerating the events which constitute default, § 9.01 includes

(d) failure on the part of the Company duly to observe or perform any other of the covenants or agreements on the part of the Company in the Debentures or in this Indenture contained, continued for a period of 90 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Company by the Trustee, or to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the Debentures at the time outstanding. . . .

A finding that the defendants breached the indenture would constitute a failure to perform the agreements in the indenture. The initial suit by the plaintiff, who represents in excess of 95 percent of the debentureholders at the time of the breach, constitutes adequate notice of such failure and sufficient demand that the failure be remedied. The court may thus find that the formal requirements of § 9.01(d) have been complied with.

The availability of adequate legal remedies, through the default provisions or monetary damages, is sufficient reason to avoid the significant interference with ongoing corporate operations which equitable relief, either through forced redemption or restoration of the conversion privilege, could possibly create.

### E. *Summary of Our Holding as to the State Law Claims*

We find the terms of the 1967 Collins indenture to be ambiguous.

The plaintiff is entitled to a jury determination of his claims which charge breach of contract and, if a contractual breach is found, those which allege breach of fiduciary duty.

If the verdict is for the plaintiff, the Court may grant relief through acceleration of the maturity date or appropriate monetary damages.

### V

### *The 10b–5 Claims*

We have already stated that in our opinion the plaintiff failed to make out a claim for 10b–5 relief. We now state our reasons for this result.

Plaintiff contends that the defendants violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[16] and Rule 10b–5, 17 C.F.R. § 240.10b–5,[17] issued by the Securities and Exchange Commission pursuant thereto. The violations allegedly occurred in two separate contexts. Count I charges that the defendants engaged in a continuing course of conduct from 1967 until 1973 to omit the disclosure of certain material facts to the purchasers of the Collins 4⅞% Convertible Subordinated Debentures. Plaintiff argues that the defendants failed to inform debenture purchasers that in the event Collins merged into, consolidated with, or was acquired by, another corporation, the successor corporation could substitute a right to convert into cash for the right to convert into common stock. According to plaintiff, this constituted a knowing, intentional, and reckless failure to disclose a material fact.

Count II focuses upon defendants' conduct in connection with the 1973 Supplemental Indenture. Plaintiffs assert that the defendants schemed to defraud the debentureholders of their right to convert the debentures into common stock and to substitute therefor a right to convert the debentures into cash.

The District Court denied both claims. In Count I the Court noted that *scienter* is an essential element of the asserted claim and held that the record contained no evidence which would support a finding that the defendants intended to deceive the purchasers of the debentures. In rejecting Count II, the Court offered three independent grounds: (1) The record disclosed no evidence that the defendants acted with *scienter.* (2) Defendants correctly construed the Indenture in 1973, and the rights of the debentureholders were fully respected when Collins and Rockwell merged. (3) The alleged wrongs did not occur in connection with a purchase or sale of a security. In addition, the District Court held that the record was devoid of evidence from which reasonable men could find "actual damage" with respect to either 10b–5 claim.

Our analysis of the 10b–5 claims takes place against an extensive background of recent Supreme Court and appellate court decisions interpreting § 10(b) and Rule 10b–5. Although § 10(b) does not by its terms create an express civil remedy for its violation, the existence of a private cause of action for violations of the statute and the Rule is now well established.[18]

16. Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, provides in pertinent part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

17. Employment of manipulative and deceptive devices.
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

18. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477–80, 97 S.Ct. 1292, 1303–1304, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 1922–1923, 44 L.Ed.2d 539 (1975); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 150–54, 92 S.Ct. 1456, 1470–1472, 31 L.Ed.2d 741 (1972); *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971). *See also Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 93 (5th Cir. 1975); *Reed v. Riddle Airlines*, 266 F.2d 314 (5th Cir. 1959).

## A. *Purchase or Sale*

We turn first a consideration of whether the alleged unlawful conduct of defendants occurred in connection with a purchase or sale of securities. The courts have required that the plaintiffs be actual purchasers or sellers to maintain an action under 10b–5, with the classic expression of this doctrine appearing in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). Although the requirement has received judicial and academic criticism,[19] the Supreme Court forcefully reaffirmed the *Birnbaum* doctrine in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). We have likewise required that challenged conduct occur in connection with a purchase or sale of securities.[20] *See, e. g., National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295, 1298 (5th Cir. 1978); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 93 (5th Cir. 1975); *Herpich v. Wallace*, 430 F.2d 792 (5th Cir. 1970).

Count I alleges violations with respect to the purchases of the 4⅞% Convertible Subordinated Debentures originally issued in 1967. Here the plaintiffs are purchasers within the clearest sense of the word and may bring a 10b–5 claim.

The disposition of Count II, alleging fraud in connection with the 1973 Supplemental Indenture, is more difficult. Plaintiffs contend that in effect they exchanged a debenture with a common stock conversion right for a debenture without such a conversion right as a result of the Supplemental Indenture. Accordingly, they assert that this exchange complies with the requirements for the applicability of § 10(b) and Rule 10b–5.

We have been unable to locate any appellate case which has directly addressed whether the execution of a supplemental indenture affecting the conversion rights of an indenture constitutes a purchase or sale under 10b–5.

In determining what may be considered a purchase or a sale, we look to the meaning of the words within the context of section 10(b). *SEC v. National Securities, Inc.*, 393 U.S. 453, 466, 89 S.Ct. 564, 571–572, 21 L.Ed.2d 668 (1969). The Exchange Act defines a purchase to include "any contract to buy, purchase, or otherwise acquire" securities, 15 U.S.C. § 78c(a)(13). The Securities Act defines a sale to include "any contract to sell or otherwise dispose of" securities, 15 U.S.C. § 78c(a)(14). The Supreme Court admonishes that section 10(b) "must be read flexibly, not technically and restrictively." *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. at 12, 92 S.Ct. at 169. We note as well, that a statutory "purchase" or "sale" is not necessarily a technical purchase or sale in the common-law sense. *See, e. g., Herpich v. Wallace*, 430 F.2d 792, 806 (5th Cir. 1970). At the same time, however, the Court has cautioned against too freely allowing causes of action through expanded definitions under the anti-fraud provisions of the Securities Exchange Act. *See, e. g., Santa Fe Industries, Inc. v. Green*, 430 U.S. at 477–78, 97 S.Ct. at 1303. Indeed the Court's recent decisions generally have cut back on the scope of protection allowed under § 10(b).[21] We particularly note the Court's

---

19. *See, e. g.*, the discussion in *Rekant v. Desser*, 425 F.2d 872 (5th Cir. 1970).

20. A debenture is expressly included in the definition of "security." 15 U.S.C. § 78c(a)(10).

21. See *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979) (noncontributory, compulsory pension plan does not constitute a "security" within the meaning of the Securities Acts); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (absent deception or manipulation, unfairness or breach

of fiduciary duty in connection with a securities transaction does not constitute a 10b–5 cause of action); *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (tender offeror has not private cause of action for damages under § 14(e) of the Securities Exchange Act); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 688 (1976) (no cause of action under 10b–5 for conduct that is merely negligent); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (omitted fact is material under Rule 14a–9 if there is a "sub-

warning in *Blue Chip Stamps* that "the wording of § 10(b), making fraud *in connection with the purchase or sale of a security* a violation of the Act, is surely badly strained when construed to provide a cause of action, not to purchasers or sellers of securities, but to the world at large." 421 U.S. at 733 n.5, 95 S.Ct. at 1924 n.5 (emphasis in original).

We are also guided by the *Blue Chip Stamps* assertion that the *Birnbaum* doctrine bars three principal classes of potential plaintiffs from maintaining an action under Rule 10b–5; first, potential purchasers of shares; second, actual shareholders who refrain from selling; and third, shareholders who claim that fraudulent activity decreased the value of their investment. See *Sacks v. Reynolds Securities, Inc.*, 193 U.S.App.D.C. 80, 87, 593 F.2d 1234, 1241 (D.C.Cir.1978).

The courts have considered a variety of transactions to constitute a purchase or sale under § 10(b). In *Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), the Second Circuit held that the plaintiff is a seller when a corporation in which he is a stockholder is merged into the defendant corporation. In *Vine* the plaintiff was a shareholder in Crown Finance Company, most of whose stock had been acquired by Beneficial Finance Corporation, which could effect a short-form merger. Although the plaintiff had retained his shares in Crown Finance, his only remaining right was either to sell his stock for Beneficial's cash offer or to pursue his appraisal rights, which would also result in a cash payment for his shares. The court stated that in order for the plaintiff to realize any value for his stock, as a practical matter, he must eventually become a party to a sale and thus he was a seller under

Rule 10b–5. The Second Circuit later applied this "forced seller" rationale to a tender-offer situation in *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970).

We have stated the informing principle of *Vine* to be that "a shareholder should be treated as a seller when the nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares." *Dudley v. Southeastern Factor and Finance Corp.*, 446 F.2d 303, 307 (5th Cir.), *cert. denied sub nom. McDaniel v. Dudley*, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971). We have ourselves adopted the "forced seller" doctrine as outlined in *Vine*. In *Coffee v. Permian Corp.*, 434 F.2d 383 (5th Cir. 1970), 474 F.2d 1040 (5th Cir.), *cert. denied*, 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973), we found the facts very similar to those in *Vine* and concluded that, as a practical matter, the plaintiff shareholder had no choice but to surrender his interest in the corporation and to exchange his shares for cash, thereby falling within the statutory definition of sale. *See also Dudley v. Southeastern Factor and Finance Corp.*, 446 F.2d 303 (5th Cir.), *cert. denied sub nom. McDaniel v. Dudley*, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971) (liquidation of corporation constitutes sale of shareholders' shares in it).

Along the same lines, the Supreme Court has held that in an action by the Securities and Exchange Commission the simple exchange of shares in a merger qualifies as a purchase or sale. *SEC v. National Securities, Inc.*, 393 U.S. at 467, 89 S.Ct. at 572. The Sixth Circuit has extended this to the context of private actions, relying heavily upon the reasoning in *Vine*.[22] *Marsh v.*

---

stantial likelihood" that the disclosure of the omitted fact would have been viewed by the reasonable investors as having significantly altered the "total mix" of information made available).

**22.** The Third Circuit has expressed a similar view in *In re Penn Central Securities Litigation,*

*M. D. L. Dkt. No. 56,* 494 F.2d 528 (3d Cir. 1974):

In such a merger between two corporations, the original shareholders of each corporation end up with stock in a substantially different company with substantially different, assets and prospects. The decision to vote in favor of the merger is therefore little

*Armada Corp.*, 533 F.2d 978 (6th Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977). *But see Gaudin v. KDI Corp.*, 576 F.2d 708 (6th Cir. 1978) (promise not to sell does not give rise to 10b–5 claim). In a related area, the Second Circuit has found the redemption of convertible debentures to be within the meaning of the statute. *Drachman v. Harvey*, 453 F.2d 722 (2d Cir. 1972) (en banc).

We, however, have drawn limits on the "forced seller" doctrine and the merger exchange situation. In *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974), we denied direct standing to a shareholder of a merged company who had the right to exchange his shares for shares of the surviving company. We observed that the plaintiff was still entitled to an interest in a going concern and was not forced to liquidate his interest for value. Consequently, he was not a forced seller. In *Sargent v. Genesco, Inc.*, 492 F.2d 750 (1974), we rejected plaintiffs' argument that the issuance of new shares so diluted their position as shareholders as to give them 10b–5 standing as forced sellers. Our decision there drew upon our earlier opinion in *Wolf v. Frank*, 477 F.2d 467 (5th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973), where we stated that plaintiffs did not have standing to challenge a dilution of equity interest because they were neither purchasers nor sellers in connection with that transaction.

On the other hand, we have found a purchase or sale in other contexts. In *Rekant v. Desser*, 425 F.2d 872 (5th Cir. 1970), we held that a corporation issuing its own treasury shares is an issuer of securities.[23] There we relied in part on our decision in *Hooper v. Mountain States Securities Corp.*, 282 F.2d 195 (5th Cir. 1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693

(1961), where we held that the issuance of stock in exchange for worthless assets constituted a 10b–5 sale.

At the same time, this Court has not been willing to extend the definition of a purchase or sale as broadly as have other circuits. In *National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295 (5th Cir. 1978) we held that the pledge of securities as collateral for a commercial loan on a promissory note was not a purchase or sale under 10b–5. In doing so we reaffirmed similar holdings in slightly different contexts. *Reid v. Hughes*, 578 F.2d 634 (5th Cir. 1978); *McClure v. First National Bank*, 497 F.2d 490 (5th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Herpich v. Wallace*, 430 F.2d 792 (5th Cir. 1970). We recognized that other circuits had held roughly similar facts to come within the statute. *National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d at 1299. *Cf. Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017 (6th Cir. 1979); *Mallis v. FDIC*, 568 F.2d 824 (2d Cir. 1977), *cert. dismissed sub nom. Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978); *United States v. Gentile*, 530 F.2d 461 (2d Cir.), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976) (holding the pledge of stock as collateral to be a purchase or sale).

Though no single one can be considered determinative, several general considerations emerge from our prior decisions. First, we have usually found § 10(b) applicable where there has been some surrendering of ownership or control of the security, while, as in the case of pledges of stock as collateral, we have found transactions which create encumbrances on the security without altering the underlying ownership interest to be beyond the purview of the statute. Second, we have considered a

---

different from the decision to sell shares in the original corporation and, with the cash received for those shares, buy shares in the merged corporation. It clearly effectuates the remedial purposes of the securities acts, therefore, to extend their protections to such a share exchange.

**23.** The Second Circuit has reached a similar conclusion. See *Schoenbaum v. Firstbrook*, 405 F.2d 215 (1968) (en banc), *cert. denied sub nom. Manley v. Schoenbaum*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

transaction a purchase or sale where, as in the forced seller context, the nature of the security has been changed in the sense that an interest in an ongoing concern is converted exclusively into a right to cash. At the same time, we have held that transactions which significantly affect the value or condition of the stock without altering its very nature are not actions covered by § 10(b). Third, we have looked for actions that have a direct effect on the conduct of the securities market. Where the transaction affects only indirectly the ability of investors to make knowing decisions in an unmanipulated market, we have declined to find the action within the reach of § 10(b).

With this broad range of decisions and principles outstanding, we turn to the facts of plaintiff's claim. Plaintiff relies heavily upon the forced seller doctrine, arguing that in connection with the merger there was a purchase by Rockwell and a sale by each debentureholder of his debentures convertible into common stock, and that the sale was effected through an agent, the Trust Company, who acted without authority. Plaintiff further asserts that by virtue of the Supplemental Indenture, the nature of the investment (a security convertible into common stock) "has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of" $344.75.

■ We are nevertheless not quite persuaded by plaintiff's argument and refrain from extending the forced seller doctrine, which we have previously construed narrowly, to these facts. Even if we assume that the original debenture called for a right of conversion, we do not feel that the Supplemental Indenture so "substantially changed" the underlying security that it produces a purchase and sale under § 10(b). The debentureholders still have a debenture issued by a going concern. Under the Supplemental Indenture, Rockwell affirmed its assumption of Collins' obligations to make punctual payment of the principal and interest on the debentures according to the terms contained in the original issue. Rockwell has not expressly redeemed the securities, and we decline to treat its actions as, in effect, a redemption. Plaintiff has not been forced to sell its debenture. In some respects the situation resembles that of a merger exchange, which we have found beyond the protection of § 10(b).

■ Assuming the prior existence of a conversion right, the Supplemental Indenture, in eliminating that right, may affect the value of the debenture. As we have noted, however, security holders do not automatically have a cause of action under § 10(b) to challenge action which affects the value of the security.

We observe also that the purported sale falls short of the other considerations we have articulated when finding § 10(b) applicable. At no point did ownership or control of the debenture change hands. Indeed, Rockwell informed debentureholders that there would be no need to exchange the old debentures for amended ones. At all times the debentureholders possessed a debenture backed by an ongoing premise to pay principal and interest. In addition, the transaction involving the Supplemental Indenture did not directly affect the ability of investors to make knowing decisions in an unmanipulated market.

Finally, we observe that the transaction involving the Supplemental Indenture most resembles that which it claims to be—a contractual modification of an ongoing agreement. Acting on behalf of the debentureholders, the Trust Company entered into an agreement with Rockwell to amend the basic debenture agreement to reflect Collins' merged status and the current nature of the conversion right. Were it not in the securities context this action would be treated simply as a subsequent agreement by the parties to amend their basic contract. It would not be called an exchange of the old contract for the new. We see no reason to stretch the usual way of viewing the transaction solely because the underlying contract involved a security.

■ As we saw elsewhere in this opinion, plaintiff may be able to prove a claim for breach of contract or breach of fiduci-

ary duty based on the defendants' conduct in seeking to modify the original contractual arrangement, but the existence of such a claim does not mean that plaintiff may bring a 10b–5 action. The Supreme Court in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 held that unfairness in a securities transaction was not necessarily enough to create a 10b–5 cause of action and refused to permit a cause of action under 10b–5 for an alleged breach of corporate fiduciary duty. In an extensive examination of standing under Rule 10b–5 in *Herpich v. Wallace,* 430 F.2d at 805, we pointed out that § 10(b) and Rule 10b–5 "do not proscribe all fraudulent schemes concocted to take undue advantage of investors." We went on to observe, "That the conduct complained of may be reprehensible does not require the conclusion that federal remedy must be furnished." *Id.* at 809. Rather, the objectives of the Rule are purity of the securities transaction and the securities trading process. We summarized the congressional intent as follows: "Congress meant to afford investors a reasonable opportunity to make knowing, intelligent decisions regarding their purchases and sales of securities in unmanipulated markets." *Id.* at 806.

Employing similar reasoning, the Seventh Circuit has also refused to extend Rule 10b–5 to certain breaches of fiduciary or contractual duties. *O'Brien v. Continental Illinois National Bank & Trust Co.,* 593 F.2d 54 (7th Cir. 1979). The Ninth Circuit has likewise observed that not all fraudulent activities fall within the reach of the Rule. *Ohashi v. Verit Industries,* 536 F.2d 849 (9th Cir.), *cert. denied,* 429 U.S. 1004, 97 S.Ct. 538, 40 L.Ed.2d 616 (1976). *See also Sacks v. Reynolds Securities, Inc.,* 193 U.S.App. D.C. 80, 593 F.2d 1234 (D.C.Cir.1978).

Finally, in limiting the reach of the antifraud provisions of the federal securities law, the Court has relied heavily upon the fact that certain causes of action, such as breach of contract or breach of fiduciary

duty, are traditionally matters of state law. *Santa Fe Industries v. Green,* 430 U.S. at 478, 97 S.Ct. at 1304; *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 524 (1977). The *Santa Fe* Court, for example, declined to superimpose federal fiduciary standards that "would overlap and quite possibly interfere with state corporate law." 430 U.S. at 479, 97 S.Ct. at 1304.

Plaintiff's claim in connection with the 1973 Supplemental Indenture consists of traditional state law claims for breach of contract and breach of fiduciary obligations. The Supplemental Indenture and Rockwell's and Collins' actions in connection therewith possibly entailed a breach of the original debenture agreement's provision concerning the nature of the conversion right in the event of a merger, while the Trust Company's actions may have been a breach of its fiduciary responsibilities under the indenture. But these are the types of claims the courts have felt best left to state law in the absence of express direction to the contrary by Congress. The defendants' activities sought to affect their relation with the debentureholders as debentureholders; they were not directed to the manipulation of the market. Their action cannot be said to have a direct effect on an investor's ability to make knowing, intelligent purchases or sales. Plaintiff must therefore be left to his state law remedies.[24]

### B. *Scienter*

Since plaintiff is a purchaser under Count I, alleging a 10b–5 violation connection with the defendants' failure to disclose that the original debenture conversion right would terminate upon the merger of Collins, we now examine whether the defendants' conduct comes within the prohibition of the Rule.

Section 10(b) proscribes the use of "any manipulative or deceptive device or contrivance"[25] in contravention of Commission

---

24. Because we find that there was no purchase or sale, we do not reach the District Court's determination of the issue of damages under 10b–5.

25. See note 16 *supra*.

rules. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 688, the Supreme Court read § 10(b) to require an element of scienter [26] and refused to impose liability for negligent conduct alone. The Court noted that the statute employed "the commonly understood terminology of intentional wrongdoing" and that its history reflected "no more expansive intent." *Id.* at 214, 96 S.Ct. at 1391. The Court reaffirmed this view of the statute in *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480. There the Court examined the use of the term "fraud" in Rule 10b–5 and rejected the argument that it includes all breaches of fiduciary duty in connection with a securities transaction. Rather, a claim of fraud states a cause of action under Rule 10b–5 "only if the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute." *Id.* at 473–74, 97 S.Ct. at 1301.

While the Court in *Ernst & Ernst* held that negligence was not sufficient to bring conduct within the prohibition of 10b–5, the Court expressly withheld its opinion on whether recklessness was sufficient to meet the statute's scienter requirement. 425 U.S. at 193–94 n. 12, 96 S.Ct. at 1381 n. 12. Nevertheless, the Court acknowledged that in other contexts recklessness is considered to be a form of intentional conduct imposing liability. *Id.* Although we have not previously given extended analysis to liability for recklessness under 10b–5, we have intimated that recklessness meets the scienter requirement. *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). *See also Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). Other circuits have expressly held that recklessness is a sufficiently culpable state of mind for liability under § 10(b) and Rule 10b–5. *See, e. g., Mans-*

*bach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023 (6th Cir. 1979); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1039–40 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

■ We are quick to point out that reckless conduct describes "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 793 (7th Cir. 1977). Similarly, we agree with the Seventh Circuit that "reckless behavior" must not be so liberally construed as to obliterate any discernible distinction between scienter and negligence. *Id.* at 793.

■ To sustain a cause of action under § 10b–5, then, plaintiffs must show that defendants intentionally or recklessly failed to disclose material information. Without reaching the issue of whether the failure to state that the conversion right would terminate upon a subsequent cash merger of Collins constituted a material omission,[27] we do hold that plaintiff has produced no evidence to support a jury finding that the defendants acted with the requisite intent or recklessness.

First, defendant Trust Company was not a party to the original issue, having assumed its role as Trustee in 1970. No evidence linked the Trust Company to the preparation, drafting, approving, or publishing of the indenture agreement, prospectus, or related documents. What testimony there was about these documents was not admitted against the Trust Company. There is as well no testimony to link the Trust Company with any review of the doc-

---

**26.** In *Ernst & Ernst* the Court defined scienter to refer to "a mental state embracing intent to deceive, manipulate, or defraud." 425 U.S. at 194, 96 S.Ct. at 1381 n. 12.

**27.** *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *see also Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

uments affecting sales after the original ones in 1967. To be sure, there was testimony concerning the Trust Company's review of the debenture offering and preparation of documents in 1973, but this testimony goes to the alleged fraud in connection with the Supplemental Indenture, which we have held not to be a purchase or sale. With no evidence implicating the Trust Company in the issuance of the original debentures, the 10b–5 claim against it must fail.

Second, plaintiff introduced no evidence from which it could be inferred that defendants Rockwell or Collins acted unlawfully. The evidence tended to show that neither Collins nor the debentureholders actively considered the prospect of a cash merger of Collins somewhere, sometime down the road. Indeed, at the time of the offering, cash mergers were not permitted under Iowa law. In retrospect, it would have been fine if Collins had considered that possibility and drafted a provision stating what would happen in such event. Had it done so, this case probably would not now be before us. But Collins' failure to do so, though highly inconvenient now, cannot be viewed as anything more than simple negligence. It surely does not approach recklessness. We are reluctant to hold that debenture issuers must, under threat of 10b–5 penalty, explicitly anticipate every circumstance possible—even a change of those which are currently illegal—involving the issuers and the debenture.

Also, there is no testimony to support the contention that defendants Rockwell and Collins engaged in a continuing course of conduct to deceive subsequent purchasers of the securities. No testimony was offered to show that Rockwell or Collins considered the conversion issue prior to the discussion of the proposed merger. As was the case with the Trust Company, the evidence produced went to the alleged fraud and deception in connection with the execution and issuance of the Supplemental Indenture.

We thus affirm the dismissal of Count I for failure to produce evidence of scienter.

*Conclusion*

The Judgment of the District Court is, as herein set forth, AFFIRMED IN PART and IN PART REVERSED and REMANDED for further proceedings not inconsistent herewith.

## APPENDIX

### ARTICLE FOUR

#### Conversion of Debentures

SECTION 4.01. Subject to and upon compliance with the provisions of this Article Four, at the option of the holder thereof, any Debenture or any portion of the principal amount thereof which is $1,000 or a multiple of $1,000, may, at any time at or before the close of business on January 1, 1987, or in case such Debenture or portion thereof shall have been called for redemption prior to such date, then in respect of such Debenture or portion thereof until and including, but (unless the Company shall default in payment due upon the redemption thereof) not after, the close of business on the fifth day prior to the redemption date, be converted at the principal amount thereof, or of such portion thereof, into fully paid and non-assessable shares (calculated as to each conversion to the nearest 1/100th of a share) of Common Stock of the Company, at the conversion price, determined as hereinafter provided, in effect at the time of conversion.

The price at which shares of Common Stock shall be delivered upon conversion (herein called the "conversion price") shall be initially $72.50 per share of Common Stock. The conversion price shall be reduced in certain instances as provided in paragraphs (a), (g) and (h) of Section 4.04, and shall be increased in certain instances as provided in paragraph (h) of Section 4.04.

. . . . .

SECTION 4.11. In case of any consolidation of the Company with, or merger of the Company into, any other corporation (other than a consolidation or merger in which the Company is the continuing corporation), or in case of any sale, conveyance, transfer or

other disposition to any other corporation of the property and assets of the Company as an entirety or substantially as an entirety, the corporation formed by such consolidation or the corporation into which the Company shall have been merged ·or the corporation which shall have acquired such property and assets, as the case may be, shall execute and deliver to the Trustee a supplemental indenture (which shall conform to the applicable provisions of the Trust Indenture Act of 1939 as then in effect) providing that the holder of each Debenture then outstanding shall have the right (until the expiration of the conversion right of such Debenture) to convert such Debenture into the kind and amount of shares of stock and other securities and property receivable upon such consolidation, merger, sale, conveyance, transfer or disposition by a holder of the number of shares of Common Stock of the Company into which such Debenture might have been converted immediately prior to such consolidation, merger, sale, conveyance, transfer or disposition. Such supplemental indenture shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article Four. The above provisions of this Section 4.11 shall similarly apply to successive consolidations, mergers, sales, conveyances, transfers or dispositions.

SECTION 4.12. The Trustee, subject to the provisions of Section 10.01, and any conversion agent shall not at any time be under any duty or responsibility to any holder of Debentures to determine whether any facts exist which may require any adjustment of the conversion price, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed, or herein or in any supplemental indenture provided to be employed, in making the same. Neither the Trustee nor any conversion agent shall be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock, or of any securities or property, which may at any time be issued or delivered upon the Conversion of any Debenture; and neither the Trustee nor

any conversion agent makes any representation with respect thereto. The Trustee, subject to the provisions of Section 10.01, and any conversion agent shall not be responsible for any failure of the Company to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property upon the surrender of any Debenture for the purpose of conversion or to comply with any of the covenants of the Company contained in this Article Four.

## ARTICLE TEN

### Concerning the Trustee

SECTION 10.01. The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture. In case an Event of Default has occurred (which has not been cured) the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee pursuant to any provision of this Indenture, shall examine them to determine whether they conform to the requirements of this Indenture.

No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own wilful misconduct, except that

(a) prior to the occurrence of an Event of Default and after the curing of all such Events of Default which may have occurred:

(1) the duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture, and the Trustee shall not be liable except for the performance of such

duties and obligations as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2) in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture;

(b) the Trustee shall not be personally liable for any error of judgment made in good faith by a responsible officer or responsible officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts; and

(c) the Trustee shall not be personally liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than a majority in principal amount of the Debentures at the time outstanding (determined as provided in Section 11.04) relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.

SECTION 10.02. Except as otherwise provided in Section 10.01:

(a) The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors, or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, appraisal, bond, debenture or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b) Any request, direction, order or demand of the Company mentioned herein shall be sufficiently evidenced by an instrument signed in the name of the Company by the Chairman, the President, the Chairman of the Executive Committee or any Vice President and the Secretary or an Assistant Secretary, the Comptroller or a Deputy Comptroller or the Treasurer or an Assistant Treasurer (unless other evidence in respect thereof be herein specifically prescribed); and any resolution of the Board of Directors of the Company may be evidenced to the Trustee by a copy thereof certified by the Secretary or an Assistant Secretary of the Company;

(c) The Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such advice or such Opinion of Counsel;

(d) The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Indenture at the request, order or direction of any of the Debentureholders, pursuant to the provisions of this Indenture, unless such Debentureholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby; provided that nothing herein contained shall, however, relieve the Trustee of the obligation, upon the occurrence of an Event of Default (which has not been cured or waived) to exercise such of the rights and powers vested in it by this indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs;

(e) The Trustee shall not be personally liable for any action taken or omitted by

it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture;

(f) Prior to the occurrence of an Event of Default hereunder and after the curing of all Events of Default, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, appraisal, bond, debenture or other paper or document, unless requested in writing so to do by the holders of not less than a majority in principal amount of the Debentures then outstanding; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Indenture, the Trustee may require reasonable indemnity against such expense or liability as a condition to so proceeding. The reasonable expense of every such examination shall be paid by the Company or, if paid by the Trustee, shall be repaid by the Company upon demand;

(g) The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys.

. . . . .

## ARTICLE THIRTEEN

### Supplemental Indentures

SECTION 13.01. The Company, when authorized by a resolution of its Board of Directors, and the Trustee, subject to the conditions and restrictions in this Indenture contained, may from time to time and at any time enter into an indenture or indentures supplemental hereto (which shall conform to the applicable provisions of the Trust Indenture Act of 1939 as then in effect) for one or more of the following purposes:

(a) to make provision with respect to the conversion rights of holders of Debentures pursuant to the requirements of Section 4.11;

(b) to evidence the succession of another corporation to the Company, or successive successions, and the assumption by the successor corporation of the covenants, agreements and obligations of the Company pursuant to Article Fourteen;

(c) to add to the covenants and agreements of the Company in this Indenture contained such further covenants and agreements thereafter to be observed, and (subject to Section 17.03) to surrender any right or power herein reserved to or conferred upon the Company;

(d) to cure any ambiguity or to correct or supplement any defective or inconsistent provision contained in this Indenture or in any supplemental indenture; and

(e) to make such provisions with respect to matters or questions arising under this Indenture as may be necessary or desirable and not inconsistent with this Indenture; provided that such action shall not adversely affect the interests of the holders of any of the Debentures.

The Trustee is hereby authorized to join in the execution of any supplemental indenture authorized or permitted by the terms of this Indenture, to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Any supplemental indenture authorized by the provisions of this Section 13.01 may be executed by the Company and the Trustee without the consent of the holders of any of the Debentures at the time outstanding, notwithstanding any of the provisions of Section 13.02.

SECTION 13.02. With the consent (evidenced as provided in Section 11.01) of the holders (or persons entitled to vote, or to give consents respecting the same) of not less than 66⅔% in aggregate principal

amount of the Debentures at the time outstanding, the Company, when authorized by a resolution of its Board of Directors, and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto (which shall conform to the applicable provisions of the Trust Indenture Act of 1939 as then in effect) for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indenture or of modifying in any manner the rights and obligations of the holders of the Debentures and of the Company; provided, however, that no such supplemental indenture shall (i) extend the fixed maturity of any Debentures, or reduce the principal amount thereof, or reduce the rate or extend the time of payment of interest thereon, or reduce any premium payable upon the redemption thereof, or alter or impair the right to convert the same into Common Stock at the prices and upon the terms provided in this Indenture, without the consent of the holder of each Debenture so affected, or (ii) reduce the aforesaid percentage of Debentures, the holders of which are required to consent to any such supplemental indenture, without the consent of the holders of all Debentures then outstanding.

Upon the request of the Company, accompanied by a copy of a resolution of its Board of Directors certified by the Secretary or an Assistant Secretary of the Company authorizing the execution of any such supplemental indenture, and upon the filing with the Trustee of evidence of the consent of Debentureholders as aforesaid, the Trustee shall join with the Company in the execution of such supplemental indenture unless such supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion but shall not be obligated to enter into such supplemental indenture.

It shall not be necessary for the consent of the Debentureholders under this Section 13.02 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

Promptly after the execution by the Company and the Trustee of any supplemental indenture pursuant to the provisions of this Section 13.02, the Company shall mail, first class postage prepaid, to the holders of Debentures at their last addresses as they shall appear upon the register or registers, a notice, setting forth in general terms the substance of such supplemental indenture. Any failure of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

SECTION 13.03. Upon the execution of any supplemental indenture pursuant to the provisions o this Article Thirteen or of Section 4.11 or of Section 14.01, this Indenture shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitations of rights, obligations, duties and immunities under this Indenture of the Trustee, the Company and the holders of Debentures shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

SECTION 13.04. Debentures authenticated and delivered after the execution of any supplemental indenture pursuant to the provisions of this Article Thirteen or of Section 4.11 or of Section 14.01 or after any action taken at a Debentureholders' meeting pursuant to Article Twelve, may bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture or as to any action taken at any such meeting; and, in such case, suitable notation may be made upon outstanding Debentures after proper presentation and demand. If the Company or the Trustee shall so determine, new Debentures so modified as to conform, in the opinion of the Trustee and the Board of Directors of the Company, to any modification of this Indenture contained in any such

supplemental indenture, or to any action taken at any such meeting, may be prepared by the Company, authenticated by the Trustee and delivered in exchange for the Debentures then outstanding, upon demand of, and without cost to, the holders thereof, upon surrender of such Debentures.

SECTION 13.05. The Trustee, subject to the provisions of Section 10.01, may receive an Opinion of Counsel as conclusive evidence that any supplemental indenture executed pursuant to this Article Thirteen is authorized or permitted by the terms of this Indenture and that it is not inconsistent therewith.

## ARTICLE FOURTEEN

### Consolidation, Merger and Sale

SECTION 14.01. Nothing in this Indenture shall prevent any consolidation or merger of the Company with or into any other corporation or corporations (whether or not affiliated with the Company), or successive consolidations or mergers in which the Company or its successor or successors shall be a party or parties, or shall prevent any sale, conveyance, transfer or other disposition (or successive sales, conveyances, transfers or other dispositions) of the property and assets of the Company (or of its successor or successors) as an entirety or substantially as an entirety, to any other corporation (whether or not affiliated with the Company) authorized to acquire the same; provided, however, and the Company hereby covenants and agrees, that upon any such consolidation, merger, sale, conveyance, transfer or other disposition, the due and punctual payment of the principal of (and premium, if any) and interest on all of the Debentures, according to their tenor, and the due and punctual performance and observance of all the terms, covenants and conditions of this Indenture to be performed or observed by the Company, shall be expressly assumed, by indenture supplemental hereto, satisfactory in form to the Trustee, executed and delivered to the Trustee by the corporation formed by such consolidation, or by the corporation into which the Company shall have been merged, or by the corporation which shall have acquired such property and assets. In the event of any such sale, conveyance, transfer or other disposition, the predecessor Company may be dissolved, wound up and liquidated at any time thereafter.

SECTION 14.02. In case of any such consolidation, merger, sale, conveyance, transfer or other disposition, and upon the execution by the successor corporation of an indenture supplemental hereto, as provided in Section 14.01, and upon compliance by such successor corporation with all applicable provisions of Section 4.11, such successor corporation shall succeed to and be substituted for the Company, with the same effect as if it had been named herein as the party of the first part. Such successor corporation thereupon may cause to be signed, and may issue either in its own name or in the name of the Company, with such suitable reference, if any, to such consolidation, merger, sale, conveyance, transfer or other disposition as may be required by the Trustee, any or all of the Debentures issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee; and, upon the written order of such successor corporation, instead of the Company, and subject to all the terms, conditions and limitations in this Indenture prescribed, the Trustee shall authenticate and shall deliver any Debentures which previously shall have been signed and delivered by the officers of the Company to the Trustee for authentication, and any Debentures which such successor corporation thereafter shall cause to be signed in accordance with the provisions of this Indenture and delivered to the Trustee for that purpose. All the Debentures so issued shall in all respects have the same legal rank and benefit under this Indenture as the Debentures theretofore or thereafter issued in accordance with the terms of this Indenture as though all of such Debentures had been issued at the date of the execution hereof.

In case of any such consolidation, merger, sale, conveyance, transfer or other disposition, such changes in phraseology and form (but not in substance) may be made in the

Debentures thereafter to be issued as may be appropriate.

Nothing contained in this Indenture or any of the Debentures shall prevent the Company from consolidating or merging into itself, or acquiring by purchase or otherwise all or any part of the property of, any other corporation (whether or not affiliated with the Company).

SECTION 14.03. The Trustee, subject to the provisions of Sections 10.01 and 10.02, may receive an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale, conveyance, transfer or other disposition, and any such assumption, complies with the provisions of this Article Fourteen.