COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-05-297-CV

 

 

ROBERT
KIRK, INDIVIDUALLY AND                                       APPELLANTS

D/B/A US ASIAN CAPITAL ADVISORS, LLC, 

EUGENE M. KENNEDY, P.A., 

STEWART & ASSOCIATES, CPA=S, AND

KIMBERLY DECAMP                                                                             

 

                                                   V.

 

PRECIS, INC.                                                                         APPELLEE

 

                                              ------------

 

           FROM
THE 236TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








Robert Kirk, individually and
d/b/a U.S. Asian Capital Advisors, LLC, 
Eugene M. Kennedy, P.A., Stewart & Associates, CPA=s, P.A., and Kimberly DeCamp, appeal on three issues.  Appellants seek reversal of the trial court=s judgment notwithstanding the verdict (AJNOV@) and its
take-nothing order on the jury award of approximately $1.1 million.  Because we affirm the JNOV on Appellants= negligence and negligent undertaking claims, we do not reach  Appellants= first issue concerning damages for economic loss or Precis Inc.=s single cross-issue on mitigation of damages.

BACKGROUND








In February 2000, Appellee
made an initial public offering (AIPO@) of common
stock.  Barron Chase Securities, an
investment banking firm, was the IPO=s managing underwriter,[2]
and Kirk was Barron Chase=s chief
executive officer at the time.  To
compensate Barron Chase, Appellee issued 100,000 warrants[3]
to Barron Chase, documented in the AUnderwriter=s Warrant
Agreement.@  Appellee also issued 200,000 stock options[4]
to Barron Chase as payment for its work on a merger that closed around the same
time as the IPO=s closing.

Kirk received the stock
options and some of the warrants from Barron Chase; the other Appellants
received their interests through him.[5]  The options had an exercise price of
$9.37/share and an expiration date of June 30, 2003; the warrants had an exercise
price of $9.00/share and an expiration date of February 8, 2005.  Neither had realizable value unless and until
the market price rose above the exercise price.[6]

The options and warrants were
documented in written agreements under which Appellants had the contractual
right to exercise the options and warrants without any additional assistance
from Appellee.  Under these agreements,
Appellants would receive shares of common stock, not cash.








Around March 15, 2002,
Appellee=s outside securities counsel, Michael Dunn, discussed with Kennedy and
Kirk an alternative method not included in the governing agreements for
exercising their options and warrants for cash instead of stock.  This method involved the sale of stock to a
third party through a broker before either Appellants or the broker owned or
had possession of the shares; the strike price would be delivered to Appellee
and the balance returned to the broker. 
Because neither Appellants nor the broker would have the shares before
the sale, they sought a Averification
letter@ from Appellee to confirm the existence and validity of the options
and warrants and a commitment to timely deliver the shares.  Kennedy described this type of transaction as
Acashless exercise with brokers at risk.@  Dunn referred Appellants to
David May, Appellee=s general
counsel.

Between February and early
April 2002, Appellants opened accounts with Burt Arnold=s brokerage firm.  In April
2002, they sought to exercise their options and warrants under the alternative
method because they wanted cash instead of stock.  Arnold, Kirk, and Kennedy pursued the
verification letter from May as the stock price rose.  May testified that he had issued verification
letters before, but that Arnold wanted something different.








Arnold testified that he
would not write the letter himself for compliance reasons.  On April 30, 2002, Arnold sent May a fax of a
document that Agoes over
the different things that our firm needs to proceed.@  The final letter was not
issued until July 18, 2002, at which point the stock price was below the
exercise price for both options and warrants. 
It is undisputed that Appellants never gave orders to Arnold, their
broker, to exercise the options and warrants as provided by the governing
contracts.  Appellee=s stock peaked at $16.95 per share on April 29, 2002.

Around November 2002,
Appellants complained that May=s delay in issuing the letter prevented them from exercising their
options and warrants and sent a demand letter to Appellee, seeking their lost
profits.  Appellants filed suit on August
29, 2003, seeking as damages the difference between the stock=s market value on May 7, 2002, and the strike price of the options and
warrants. In addition to their negligence claims, Appellants also brought
claims for breach of contract, resolved in Appellee=s favor by summary judgment, and fraud, which the jury did not
find.  The jury found for Appellants on
the negligent undertaking and negligence claims and awarded Appellants
approximately $1.1 million in damages. 
The court then granted Appellee=s motion for a JNOV on the negligence and negligent undertaking
claims, and ordered that Appellants take nothing.

JUDGMENT NOTWITHSTANDING THE
VERDICT








Appellants claim that the
trial court erred by rendering a JNOV over the jury=s affirmative findings on general negligence and negligent undertaking
and that they are entitled to recover damages under these theories for their
economic loss.

Standard Of Review








A trial court may disregard a
jury verdict and render a JNOV if no evidence supports the jury findings on
issues necessary to liability or if a directed verdict would have been
proper.  See Tex. R. Civ. P. 301; Tiller v.
McLure, 121 S.W.3d 709, 713 (Tex. 2003); Fort Bend County Drainage Dist.
v. Sbrusch, 818 S.W.2d 392, 394 (Tex. 1991).  A directed verdict is proper only under
limited circumstances: (1) when the evidence conclusively establishes the right
of the movant to judgment or negates the right of the opponent; or (2) when the
evidence is insufficient to raise a material fact issue.  Prudential Ins. Co. v. Fin. Review Servs.,
Inc., 29 S.W.3d 74, 77 (Tex. 2000); Ray v. McFarland, 97 S.W.3d 728,
730 (Tex. App.CFort Worth
2003, no pet.).  To determine whether the trial court erred by rendering a JNOV, we
view the evidence in the light most favorable to the verdict under the well‑settled
standards that govern legal sufficiency review. 
See Wal‑Mart Stores, Inc. v. Miller, 102 S.W.3d 706, 709
(Tex. 2003).  In reviewing the legal
sufficiency of the evidence, we view the evidence in the light most favorable
to the verdict, crediting evidence favorable to the jury findings if reasonable
jurors could and disregarding evidence contrary to the findings unless
reasonable jurors could not.  See City
of Keller v. Wilson, 168 S.W.3d 802, 807, 827 (Tex. 2005).  Where, as here, the trial court gives no
basis for its JNOV and the motion presented multiple grounds, Appellants have
the burden of showing that the JNOV cannot be sustained on any of the stated
grounds.  See Sbrusch, 818 S.W.2d
at 394. 

General Negligence 

In their third issue,
Appellants argue that Appellee owed them a duty to use reasonable care in
handling the exercise of options and warrants, including issuance of the
verification letter, and that the evidence shows that Appellee breached this
duty by failing to issue the verification letter in a timely manner, causing
their lost profits. 








At common law, a negligence
cause of action consists of (1) a legal duty owed by one person to another, (2)
a breach of that duty, and (3) damages proximately resulting from the
breach.  Firestone Steel Prods. Co. v.
Barajas, 927 S.W.2d 608, 613 (Tex. 1996); Greater Houston Transp. Co. v.
Phillips, 801 S.W.2d 523, 525 (Tex. 1990). 
However, a party=s acts may
breach duties in tort, contract, or both, and the nature of the injury most
often determines which duty or duties are breached.  See Jim Walter Homes, Inc. v. Reed,
711 S.W.2d 617, 618 (Tex. 1986).  Here,
Appellants seek damages for the profits they would have made had they exercised
their options and warrants.  When the
injury is only the economic loss to the subject of a contract itself, the
action sounds in contract.  Id.  Any duties owed to Appellants by Appellee
when Appellee initially issued the options and warrants were contractual in
nature.  However, we must continue our
analysis to account for any change in the relationship after the cashless
exercise method and verification letter were proposed.

Duty Of Care

A prerequisite to tort
liability is the existence of a legally cognizable duty. Barajas, 927
S.W.2d at 613.  The plaintiff must
establish both the existence and the breach of a duty owed to the plaintiff by
the defendant to establish liability in tort. 
Phillips, 801 S.W.2d at 525; Otis Eng=g Corp. v. Clark, 668 S.W.2d 307, 309
(Tex. 1983).  We review the determination
of duty in a negligence action on a de novo basis, from the facts surrounding
the occurrence in question.  See
Phillips, 801 S.W.2d at 525.  In a
two-part analysis, we balance the duty factors, listed below.  See Golden Spread Council, Inc. No. 562 of
Boy Scouts of Am. v. Akins, 926 S.W.2d 287, 292 (Tex. 1996).  Then, if these do not weigh in favor of
imposing a duty, we consider whether a special relationship exists between the
parties under which a duty would arise as a matter of law.  See id.

 








Duty Factors

Imposing a legal duty
involves balancing the risk and foreseeability of injury, the social utility of
the actor=s conduct,
the consequences of imposing the burden on the actor, and any other relevant
competing individual and social interests implicated by the facts of the
case.  Tex. Home Mgmt., Inc. v. Peavy,
89 S.W.3d 30, 33‑34 (Tex. 2002); Otis Eng=g Corp., 668 S.W.2d at 309. Although
the formulation and emphasis varies with the facts of each case, three
categories of factors have emerged: (1) the relationship between the parties;
(2) the reasonable foreseeability of harm to the person injured; and (3) public
policy considerations.  Peavy, 89
S.W.3d at 34.  Of these factors,
foreseeability of the risk is Athe foremost and dominant consideration.@  See Phillips, 801
S.W.2d at 525.  Foreseeability means that
an actor, as a person of ordinary intelligence, should have anticipated the
dangers that his negligent act created for others.  Lee Lewis Constr., Inc. v. Harrison,
70 S.W.3d 778, 785 (Tex. 2001).








Prior to Appellants= request for a verification letter from Appellee around the end of
April 2002, the parties=
relationship was purely contractual in nature. 
Appellants= request for
a letter that would provide the reassurance their broker needed to facilitate
the exercise of their options and warrants for cash, outside the terms of the
governing agreements, and Appellee=s initial agreement to issue the letter in the format requested by
Appellants= broker, may
have heralded some change in the parties= relationship.

However, Appellants retained
the ability to exercise their options and warrants under the contractual
methods at any time.  Their risk was the
same risk faced by any other investorCthe rise and fall of stock prices. 
See, e.g., Miga v. Jensen, 96 S.W.3d 207, 216 (Tex. 2002)
(discussing stock appreciation in breach of contract context).  Because these contractual methods were not
eliminated, the type of harm Appellants suffered was unforeseeable because reliance
on Appellee to issue the letter to their broker was not the sole method to
exercise their options and warrants.  Cf.
Otis Eng=g Corp., 668 S.W.2d at 311 (imposing duty of reasonable care in employer=s exercise of control over intoxicated employee at work to prevent
foreseeable risk of harm to public from sending a drunk driver out on the
road).








The social utility of
Appellee=s conduct and the magnitude of the burden involved in imposing a duty
on Appellee to timely issue the letter, although also minimal under these
circumstances, still outweigh the low risk to Appellants, who could have
exercised their options and warrants as set out in the agreements at any time
prior to the issuance of the letter on July 18, 2002. The Appellants who
spearheaded the effort to obtain the letter, Kirk and Kennedy, were not novices
to securities transactions.  Instead,
they were sophisticated investorsCKennedy was an attorney whose practice was concentrated in the
securities area, and Kirk was an experienced broker and managing
underwriter.  Therefore, based on these
particular circumstances, we conclude that Appellee did not owe a legal duty to
Appellants.  See Frank v. Bear,
Stearns & Co., 11 S.W.3d 380, 385-86 (Tex. App.CHouston [14 Dist.] 2000, pet. denied) (stating that Athe application of tort liability is ill‑suited to an arena
where downside risk is a feature inherent in the concept of the securities
market@).  However, we must still
consider whether there was a Aspecial relationship@ between the parties that would warrant imposition of a legal duty.

Special Relationship

Appellants argue that
Appellee owed them a duty of care because of a Aspecial relationship@ between a company and its option and warrant holders and claim that
industry standards support finding such a duty.








The existence of a Aspecial relationship@ that imposes a legal duty is usually hinged on the relationship
between the parties.  See, e.g., Otis
Eng=g Corp., 668 S.W.2d at 311 (imposing duty based on employer-employee
relationship).  Appellants attempt to
analogize their possession of options and warrants to purchase Appellee=s stock and Appellee=s agreement to issue the letter as giving rise to the same sort of Aspecial relationship@ that gives rise to a duty of good faith and fair dealing between an
insurer and its insured, see Arnold v. Nat=l County Mut. Fire Ins. Co., 725 S.W.2d
165, 167 (Tex. 1987), and the standard of care in professional malpractice
claims, see CBI NA-CON, Inc. v. UOP Inc., 961 S.W.2d 336, 343-44 (Tex.
App.CHouston [1st Dist.] 1997, writ denied) (Mirabal, J., dissenting).

However, although Appellants
argue that Appellee Awas in the
unique position to control the timing of Appellants= transaction@ by issuing
the letter, and that this gave rise to a Aspecial relationship,@ this argument fails to account for their continued retention of
rights to receive stock instead of cash, as contemplated by the governing
agreements.  This is unlike the insured
in Arnold, who confronted unequal bargaining power, see 725
S.W.2d at 167, or the engineers in CBI NA-CON, whom the dissent asserted
had a duty to their clients to use the skill and care in the performance of
their duties commensurate with the requirements of their profession, see
961 S.W.2d at 343-44.

To support their argument
that a tort obligation existed, Appellants cite two federal cases involving
debenture holders.  See Pittsburgh
Terminal Corp. v. Baltimore & Ohio R.R. Co., 680 F.2d 933 (3d Cir.
1982); Broad v. Rockwell Int=l Corp., 614 F.2d 418 (5th Cir.
1980).  ADebentures@ are
corporate bonds not secured by specific property.  See Scott,
supra note 3, available at http://dictionary.reference.com/browse/debenture.









Pittsburgh Terminal Corp. involved a corporation that deliberately withheld critical
information from convertible debenture holders.[7]  680 F.2d at 940‑41.  The court imposed a legal duty on the
corporation to refrain from withholding such information when it had an impact
on the debenture holders= economic
interests, applying New York contract law=s implied covenant that neither party would do anything to destroy the
right of the other party to receive the fruits of the contract.  Id. at 941.  Here, in contrast, the jury affirmatively
found no fraud, and Appellants do not appeal the trial court=s summary judgment on their breach of contract claim.  Plus, in Texas contract law, there is no
general implied covenant of good faith and fair dealing.  See City of Midland v. O=Bryant, 18 S.W.3d 209, 215 (Tex.
2000).








Broad indicated that if a jury found that the corporation fully complied
with the terms of the debenture agreement, then there could be no fiduciary
duty claim because the corporation=s duty to the debentureholders was to see that they were treated
fairly and that they received what they were entitled to under the
agreement.  614 F.2d at 431.  If the jury found breach of contract, then
the debentureholders would also have to show bad faith, fraud, or unfair
conduct to find a breach of fiduciary duty. 
Id.  It based the fiduciary
duty rationale on the duty of controlling shareholders to the corporation and
minority shareholders, extending it to debentureholders and creditors within
the confines of the contract.  See id.
at 430-31.  Again, this is inapposite
here because there was no breach of the agreements governing the options and
warrants.

The third case cited by
Appellants involved a stock option holder whose options were governed by an
agreement that gave the corporation=s board of directors absolute discretion in adjusting the strike
price.  Hyman v. Ocean Optique
Distrib., Inc., 734 So.2d 546, 547‑48 (Fla. Dist. Ct. App.
1999).  The Hyman court held that there
was an implicit covenant of good faith in the exercise of such discretion.  Id. at 548.  There is no such discretion at issue
here.  So while we do take into account
the law of other states, federal law, and the views of respected and
authoritative restatements and commentators in determining whether a legal duty
exists, see SmithKline Beecham Corp. v. Doe, 903 S.W.2d 347, 351 (Tex.
1995), we are not bound by those authorities, Penrod Drilling Corp. v.
Williams, 868 S.W.2d 294, 296 (Tex. 1993). 
Moreover, we decline Appellants= invitation to impose a duty based on such tenuously analogous
circumstances.













Appellants also argue that
industry standards establish a basis for foreseeability to support a negligence
finding.  They claim that it was industry
custom to issue a verification letter for the alternative method they sought to
use and so their harm was foreseeable when the letter was not timely issued.
General industry practices may establish a basis for foreseeability to
show negligence.  See Ernst &
Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 581 (Tex.
2001).  However, while industry standards
are evidence of the appropriate standard of care, they are not
dispositive.  See Morris v. JTM
Materials, Inc., 78 S.W.3d 28, 50-51 (Tex. App.CFort Worth 2002, no pet.).   Appellants
cite this court=s opinion in
American Airlines Employees Federal Credit Union v. Martin to support
their industry standards argument. 991 S.W.2d 887, 899‑900 (Tex. App.CFort Worth 1999), aff=d in part, rev=d in part on other grounds, 29 S.W.3d
86 (Tex. 2000).  However, in that case,
the credit union already had a legal duty to protect its customer=s account.  Id. at
899.  We held that any of the credit
union=s procedures that failed to conform to that duty could not be
commercially reasonable, in spite of evidence of industry standards to the
contrary brought by the credit union.  Id. at 899-900.  In contrast, here, the issue is whether there
was a legal duty at all. Appellants= expert testified with regard to the industry standard in the issuance
of verification letters, i.e., to respond timely, but also testified that the
alternative method Appellants sought to use was Adefinitely not standard.@[8] Because this was an unusual transaction, we conclude that the expert
testimony on general industry practice here was not dispositive in establishing
foreseeability.

We hold that under these
circumstances, the trial court=s decision to disregard the jury=s verdict as to Appellants= negligence claim was correct, because, as a matter of law, Appellee
owed no legal duty to Appellant.  See
Frank, 11 S.W.3d at 386.  Because we
hold that no legal duty exists in these circumstances, we overrule Appellants= third issue.

Negligent Undertaking

In their second issue,
Appellants claim that this case=s circumstances support a claim for negligent undertaking, that such a
claim is not necessarily dependent upon whether physical injury or property
damage resulted from the undertaking in question, and that there was legally
sufficient evidence to support the jury=s affirmative findings.  They
argue that they relied on May, as Appellee=s employee, to timely issue the verification letter and that May=s performance substantially increased their risk of harm.








The negligent undertaking
rule states that a party who undertakes, gratuitously or for consideration, to
render services to another party may be subject to liability if (1) the party
undertook to perform services that it knew or should have known were necessary
for the other party=s
protection; (2) the party failed to exercise reasonable care in performing
those services; and either (3) the other party relied upon the party=s performance, or (4) the party=s  performance increased the
other party=s risk of
harm.  See Torrington Co. v. Stutzman,
46 S.W.3d 829, 838-39 (Tex. 2000) (citing Colonial Sav. Ass=n v. Taylor, 544 S.W.2d 116, 119-20
(Tex. 1976) and Restatement (Second) of
Torts ' 323
(1965)).








A negligent undertaking
requires an affirmative act upon which reliance can be based.  See Entergy Gulf States, Inc. v. Akrotex,
Inc., 40 S.W.3d 201, 206 (Tex. App.CBeaumont 2001, no pet.) (concluding no negligent undertaking when
Akrotex complained of Entergy=s failure to act, presented no evidence of reliance, and sought no
damages for any physical harm to persons or property).  Here, Appellants presented evidence that
Appellee, through May, agreed to issue a verification letter to their broker,
and did in fact issue the letter, albeit later than Appellants desired.  Viewing the evidence in a light most
favorable to the verdict,[9]
Appellee either knew or should have known that Appellants considered this
letter necessary to exercise their options and warrants using the alternative
method.  However, this letter was not
necessary for Appellants= Aprotection,@ because, at
all times, Appellants had the right and ability to exercise their options and
warrants under the governing agreements.[10]
 Therefore, the trial court did
not err in granting Appellee=s motion for JNOV as to Appellants= negligent undertaking claim, because Appellants failed to prove the
first element of that claim.  We overrule
Appellants= second
issue.

 

 

 

 

 

 








 

CONCLUSION

Because we overrule
Appellants= issues as
to their negligence and negligent undertaking claims, we do not reach their
issue addressing the Aeconomic
loss@ rule as there are no recoverable damages on their substantive claims.[11]  Accordingly, we affirm the trial court=s JNOV.

Because we affirm the trial
court=s JNOV, we do not reach Appellee=s single cross-issue on mitigation of damages.  See Tex.
R. App. P. 47.1

 

 

DIXON W. HOLMAN

JUSTICE

 

PANEL A: 
LIVINGSTON, HOLMAN, and WALKER, JJ.

DELIVERED: 
December 14, 2006











[1]See Tex.
R. App. P. 47.4.





[2]An IPO underwriter is an entity
that assumes the task of selling securities on behalf of an issuing company.  Barron Chase assumed the financial risk of
guaranteeing to Appellee that it would obtain its initial offering price of
$6.00 per share.





[3]A Awarrant@ is Aa security that permits its owner
to purchase a specific number of shares of stock at a predetermined price. . .
. [They] usually have limited lives [and] [t]heir values are considerably more
volatile than the values of the underlying stock.@ 
See David L. Scott, Wall
Street Words: An A to Z Guide to
Investment Terms for Today=s Investor
(2003), available
at http://dictionary.reference.com/browse/warrant.





[4]A Astock option@ is defined as Aan option to buy or sell a specific
number of shares of stock at a fixed price until a specified date.@ 
Scott, supra note
3, available at http://dictionary.reference.com/search?q=stock option.





[5]Cumulatively, Appellants held
200,000 options and 61,000 warrants for Appellee=s stock.  Kirk initially received all of them from
Barron Chase.  He then transferred the
warrants: 9,000 to U.S. Asian Capital, 4,000 to Stewart & Associates, and
48,000 to DeCamp.  Kirk is the 100
percent stockholder of U.S. Asian Capital. 
Kirk transferred the 200,000 options to DeCamp, who, at Kirk=s request, transferred 15,000 to
Kennedy and 15,000 to a non-Appellant; she retained 170,000.





[6]An exercise price is also known as
a Astrike price.@ 
This is the price at which the warrant could be used to purchase stock.





[7]A Aconvertible debenture@ is a debenture which can be
converted into stock at the option of the holder at a specified date in the
future. Investorwords.com, Convertible debenture,
http://www.investorwords.com/1112/convertible_debenture.html (last visited

Nov. 22, 2006).





[8]He also testified that he had never
specifically been requested to render a verification letter.  Kennedy testified that this type of
transaction, Acashless exercise with brokers at
risk,@ is not common.





[9]The number of phone calls made by
Appellants to May between April 26 and July 18, the content and utility of the Asample@ letter Arnold sent to May, and the
timing of Appellants= request for changes to May=s original verification letter
draft were all disputed at trial.  We
credit this evidence as favorable to the jury=s finding of negligent
undertaking.  See City of Keller,
168 S.W.3d at 807. 





[10]Moreover, under the alternative
method, the only protection the verification letter could have provided was to
the broker, rather than Appellants, because this was a Abrokers at risk@ transaction.





[11]See Tex.
R. App. P. 47.1  We note that tort
damages are generally not recoverable unless the plaintiff suffers an injury
that is independent and separate from the economic losses that would be
recoverable under a breach of contract claim. 
See Heil Co. v. Polar Corp., 191 S.W.3d 805, 815 (Tex. App.CFort Worth 2006, pet. filed).